**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 19, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

JANEEN MEDINA, individually, and
on behalf of all others similarly
situated, and on behalf of the CHI
Plans,

     Plaintiff - Appellant,

v.

CATHOLIC HEALTH INITIATIVES;
GERALDINE BEDNASH;
MAUREEN COMER; RICHARD
CORRENTE; DAVID R. EDWARDS;
KATHERINE GRAY; BARBARA
HAGEDORN; JAMES HAMILL;
ANTOINETTE HARDY-WALLER;
PHYLLIS HUGHES; DONALD
JONES; ANDREA J. LEE; DAVID R.
LINCOLN; KEVIN E. LOFTON;
CHRISTOPHER R. LOWNEY;
ELEANOR F. MARTIN; MARY
MARGARET MOONEY; LILLIAN
MURPHY; MARY JO POTTER;
PATRICIA SMITH; EDWARD
SPEED; DEAN SWINDLE;
PATRICIA G. WEBB; JOHN AND
JANE DOES, 1-10, whose true names
are unknown,

     Defendants - Appellees.

------------------------------------------------

No. 16-1005

AMERICAN ASSOCIATION OF
RETIRED PERSONS; FREEDOM
FROM RELIGION FOUNDATION;
PENSION RIGHTS CENTER;
AMERICANS UNITED FOR
SEPARATION OF CHURCH AND
STATE; AMERICAN CIVIL
LIBERTIES UNION; GUIDESTONE
FINANCIAL RESOURCES OF THE
SOUTHERN BAPTIST
CONVENTION; THE PENSION
BOARDS-UNITED CHURCH OF
CHRIST, INC.; CHURCH
ALLIANCE; THE CATHOLIC
HEALTH ASSOCIATION OF THE
UNITED STATES,

Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:13-CV-01249-REB-KLM)**

---

Ron Kilgard, Keller Rohrback L.L.P., Phoenix, Arizona (Lynn Lincoln Sarko, Laura R. Gerber, Havila C. Unrein, and Matthew M. Gerend, Keller Rohrback L.L.P., Seattle, Washington, and Laurie B. Ashton, Keller Rohrback L.L.P., Phoenix, Arizona, and Karen L. Handorf, Michelle C. Yau, and Mary J. Bortscheller, Cohen Milstein Sellers & Toll, PLLC, Washington, D.C., with him on the briefs), Phoenix, Arizona, for Plaintiff-Appellant

Lars C. Golumbic (Sarah M. Adams and Sean C. Abouchedid, with him on the brief), Groom Law Group, Chartered, Washington, D.C., for Defendants-Appellees.

William Alvarado Riveria and Mary Ellen Signorille, AARP Foundation Litigation, Washington, D.C., on the brief for Amicus Curiae AARP.

-2-

Andrew L. Seidel, Freedom from Religion Foundation, Madison, Wisconsin, on the brief for Amicus Curiae Freedom from Religion Foundation.

Curtis L. Kennedy, Denver Colorado, Norman P. Stein, Philadelphia, Pennsylvania, and Karen W. Ferguson, Pension Rights Center, Washington, D.C. on the brief for Amicus Curiae Pension Rights Center.

Daniel Mach, American Civil Liberties Union Foundation, Washington, D.C., and Richard B. Katskee and Bradley Girard, Americans United for Separation of Church and State, Washington, D.C., on the brief for Amici Curiae Americans United for Separation of Church and State and American Civil Liberties Union.

G. Daniel Miller, Conner & Winters, LLP, Washington, D.C., and Laurence A. Hansen and Hugh S. Balsam, Locke Lord LLP, Chicago, Illinois, on the brief for Amici Curiae GuideStone Financial Resources of the Southern Baptist Convention, The Pension Boards-United Church of Christ, Inc., and The Church Alliance.

Mark E. Chopko, Marissa Parker and Brandon Riley, Stradley Ronon Stevens & Young, LLP, Washington, D.C., and Lisa J. Gilden, The Catholic Health Association of the United States, Washington, D.C., on the brief for Amicus Curiae The Catholic Health Association of the United States.

---

Before **TYMKOVICH**, Chief Judge, **BACHARACH**, and **MORITZ**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. (ERISA), generally exempts from its requirements "church plans"—employee-benefit plans established and maintained by churches for their employees. ERISA also extends that church-plan exemption to so-called

-3-

principal-purpose organizations. A principal-purpose organization is a church-affiliated organization whose principal purpose is administering or funding a benefit plan for the employees of a church or a church-affiliated nonprofit organization.

Catholic Health Initiatives (CHI) is a Denver-based nonprofit organization created to carry out the Roman Catholic Church's healing ministry. To do so, CHI operates 92 hospitals and numerous other healthcare facilities in 18 states. CHI offers a retirement plan for its employees, with more than 90,000 participants and beneficiaries, and nearly $3 billion in plan assets. The CHI plan is administered by the CHI and Affiliates Defined Benefit Plan Subcommittee (Subcommittee), whose members are appointed and removed by CHI's Board of Stewardship Trustees.

The district court held that CHI's plan was a church plan that qualified for the ERISA exemption. On appeal, we agree, concluding that CHI's plan satisfies the statutory requirements for the church-plan exemption: CHI is a tax-exempt organization associated with a church, and the Subcommittee is a proper principal-purpose organization that is also associated with a church. The ERISA exemption, moreover, does not run afoul of the United States Constitution's Establishment Clause.

-4-

# I. Background

As explained above, federal law exempts church plans from certain federally mandated reporting and funding requirements. The agencies administering ERISA consider the CHI retirement plan to be a church plan, because CHI and the Subcommittee are controlled by or associated with the Catholic Church and the Subcommittee is a principal-purpose organization.

Janeen Medina,[1] a CHI employee, filed a class action, alleging that CHI's retirement plan fails to satisfy the statutory criteria for the church-plan exemption. She contends that, since the plan does not qualify for the exemption, CHI should have complied with the reporting and funding requirements of ERISA. Medina also argues the individual defendants who administer the plan breached their fiduciary duties by failing to comply with ERISA. And, Medina argues, even if the CHI plan did qualify as a church plan, the exemption would violate the Establishment Clause of the United States Constitution.

The district court concluded CHI's plan satisfied the criteria for ERISA's church-plan exemption and dismissed her other statutory and constitutional claims.

While this appeal was pending, the Supreme Court resolved one of the issues before us, holding that an employee-benefit plan need not be established by

---

[1] Medina has since changed her last name to West, but we follow the parties and refer to her as Medina.

a church to qualify for ERISA's church-plan exemption, provided it satisfies the other statutory criteria. *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652 (2017). According to the Court, because Congress expanded "the category of plans 'established and maintained by a church' to 'include' plans 'maintained by' principal-purpose organizations, those plans . . . are exempt from ERISA's requirements.'" *Id.* at 1659. The fact that CHI's plan was not established by a church therefore does not preclude its eligibility for the church-plan exemption.

Two issues remain for our consideration. First, Medina contends CHI's plan is not a church plan because it fails to satisfy the statutory criteria, which require the plan to be maintained by a principal-purpose organization associated with a church, for the employees of an organization associated with a church. She also argues the district court erred in concluding there were no genuine disputes of material fact on this point. Second, Medina contends applying the exemption to CHI's plan would violate the Establishment Clause of the United States Constitution.

We affirm the well-reasoned and thorough decision of the district court, in an opinion that follows similar analytical lines. We find CHI's plan satisfies the relevant statutory criteria and qualifies as a church plan, and the district court did not err in concluding there were no genuine disputes of material fact. Nor does applying the exemption to CHI's plan violate the Establishment Clause. Supreme Court precedent allows Congress to provide a religious accommodation by

-6-

exempting religious organizations from regulatory schemes, especially where subjecting the religious organization to the regulatory scheme would raise constitutional questions.[2]

## II.  Analysis

Medina contends that CHI's plan is not a church plan because it fails to satisfy the statutory criteria, and that the district court erred in concluding there were no genuine disputes of material fact regarding whether the plan satisfied the statutory criteria for the exemption.  She also argues applying the exemption to CHI's plan would violate the Establishment Clause.

We address each argument in turn and conclude that CHI's plan does not violate either ERISA or the Constitution.

### A.  Statutory Framework

The Supreme Court's recent opinion in *Advocate* explains the statutory scheme at issue.  "ERISA generally obligates private employers offering pension plans to adhere to an array of rules designed to ensure plan solvency and protect plan participants.  But in enacting the statute, Congress made an important exception.  '[C]hurch plan[s]' have never had to comply with ERISA's requirements."  *Id.* at 1656 (citation omitted) (quoting 29 U.S.C. § 1003(b)(2)).

---

[2] We also grant the parties' motions to seal Volume VIII of the Appendix and Volume IX of the Supplemental Appendix.

As *Advocate* makes clear, two types of organization qualify for the church-plan exemption: churches and so-called principal-purpose organizations.

ERISA has always provided that "church plan" includes "a plan established and maintained . . . for its employees . . . by a church or by a convention or association of churches." 29 U.S.C. § 1002(33)(A).

A 1980 amendment to ERISA expanded that definition to include principal-purpose organizations. That is, the church-plan exemption includes

> a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

29 U.S.C. § 1002(33)(C)(i).

Crucially, for purposes of this definition, an "employee of a church" includes "an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches." 29 U.S.C. § 1002(33)(C)(ii)(II). That is, "employee of a church" is not limited to church employees, but includes employees of nonprofit organizations associated with a church, such as CHI claims to be.

*Advocate* rejected the view that the church-plan exemption only applied to plans established by churches. Hospital employees had argued that their employers' pension plans did not fall within the church-plan exemption because those plans were not established by a church, but rather by a principal-purpose organization. The Supreme Court disagreed, holding that "[u]nder the best reading of the statute, a plan maintained by a principal-purpose organization . . . qualifies as a 'church plan,' regardless of who established it." 137 S. Ct. at 1663. As Medina concedes, this issue is now resolved in favor of CHI. Resp. to Supp. Auth. at 1.

*Advocate* did not provide guidance on the major issue remaining in this case: whether CHI's internal benefits committee qualifies as a principal-purpose organization. The Court expressly declined to address the scope of a "principal-purpose organization," what the requisite level of association with a church was, or whether an internal benefits committee could qualify. 137 S. Ct. at 1657 n.2, 1658 n.3. We confront those questions today, and decide whether CHI's plan satisfies the statutory criteria for the church-plan exemption.

The statute imposes a three-step inquiry for entities seeking to use the church-plan exemption for plans maintained by principal-purpose organizations:

1. Is the entity a tax-exempt nonprofit organization associated with a church?

2. If so, is the entity's retirement plan maintained by a principal-purpose organization? That is, is the plan maintained by an

organization whose principal purpose is administering or funding a retirement plan for entity employees?

3.  If so, is that principal-purpose organization itself associated with a church?

Under this framework, to qualify for the church-plan exemption, CHI must receive an affirmative answer to all three inquiries.

Note that *both* the principal-purpose organization and the entity whose employees the plan benefits must be associated with a church. First, the principal-purpose organization must be associated with a church. The church-plan exemption includes "a plan maintained by a [principal-purpose organization] . . . if [the principal-purpose organization] is controlled by or associated with a church or a convention or association of churches." 29 U.S.C. § 1002(33)(C)(i).

Second, the definition of principal-purpose organization requires that the entity whose plan it is administering be associated with a church. A principal-purpose organization is one whose "principal purpose or function . . . is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, *for the employees of a church*." 29 U.S.C. § 1002(33)(C)(i) (emphasis added). And 29 U.S.C. § 1002(33)(C)(ii)(II) explains that "employee of a church" includes employees of tax-exempt organizations "controlled by or associated with a church or a convention or association of churches."

-10-

In short, a principal-purpose organization, by definition, is one that administers a retirement or welfare plan for a church or a tax-exempt organization "associated with a church." And that principal-purpose organization can only qualify for the church-plan exemption if the principal-purpose organization itself is "associated with a church."

### 1. Step One: Is the Entity a Tax-Exempt Nonprofit Organization Associated with a Church?

Under ERISA, "[a]n organization . . . is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches." 29 U.S.C. § 1002(33)(C)(iv). CHI meets this requirement.

CHI's connection to the Roman Catholic Church is a function of Roman Catholic canon law. Canon law, a body of law used in the Catholic Church, "governs the actions and rights of all Church entities." Supp. App., Vol. I at 64. The canon-law equivalent of a corporation is a "public juridic person." Under canon law, a public juridic person is an aggregate of persons or things "constituted by competent ecclesiastical authority so that, within the purposes set out for them, they fulfill in the name of the Church, according to the norm of the prescripts of the law, the proper function entrusted to them in view of the public good." 1983 Codex Iuris Canonici c.116, § 1, http://www.vatican.va/archive/ENG1104/__PD.HTM.

Since U.S. law does not recognize public juridic persons organized under canon law, public juridic persons need civil-law counterparts—normally nonprofit corporations—in order to transact civil-law business, such as holding title to property.

Catholic Health Initiatives is the civil-law counterpart of a canon-law public juridic person called Catholic Healthcare Federation (CHCF). The Catholic Church regards the two as alter egos.

As a public juridic person organized under canon law, the Catholic Church regards CHCF as an official part of the Catholic Church. A department of the Vatican approved a petition to confer public juridic personality on CHCF. And the Vatican approved CHCF's canonical statutes, which are analogous to a corporation's articles of incorporation.

CHCF is accountable to the Vatican in several ways. For example, the Vatican must approve any change in CHCF's purpose; any transfer of real property above a certain amount; the dissolution of CHCF; and changes in the canonical statutes. CHCF also makes an annual report to the Vatican.

Several factors attest the relationship between CHI and CHCF. First, CHI's Articles of Incorporation provide that it is "organized and operated . . . exclusively for the benefit of, to perform the functions of, and/or to carry out the religious, charitable, scientific, and education purposes" of CHCF. Supp. App.,

-12-

Vol. II at 482. The same people serve as Trustees of CHI and members of CHCF. And CHI's property is CHCF's property under canon law.

In addition, CHI is listed in The Official Catholic Directory, which lists Roman Catholic institutions in the United States. The listing signifies that the Archbishop of Denver has determined that CHI is "an official part of the Catholic Church." App., Vol. III at 643. That certification must be renewed annually. Noting the significance of this listing, the IRS considers any organization listed in The Official Catholic Directory "associated with" the Roman Catholic Church for purposes of ERISA's church-plan exemption. IRS General Counsel Memorandum 39007, 1983 WL 197946 at *4 (July 1, 1983).

Given CHI's close integration with the Roman Catholic Church, we agree with the district court that CHI is "associated with" a church.

Medina, however, urges us to look to the factors proposed by the Fourth Circuit in *Lown v. Continental Casualty Company,* 238 F.3d 543 (4th Cir. 2001)*,* to reach a different conclusion. In *Lown*, the court analyzed three non-exclusive factors, looking to "1) whether the religious institution plays any official role in the governance of the organization; 2) whether the organization receives assistance from the religious institution; and 3) whether a denominational requirement exists for any employee or patient/customer of the organization." *Id.* at 548. Applying these factors, the court found the healthcare organization at issue did not have a church plan, since it had formally disaffiliated from the

-13-

Baptist Convention several years before the litigation, and no denominational requirement existed. *Id.*

The Eighth Circuit applied these factors in *Chronister v. Baptist Health*, 442 F.3d 648, 653 (8th Cir. 2006), also finding that the healthcare organization at issue did not have a church plan. Here, too, the organization had formally disaffiliated from the Baptist Convention. *Id.* at 652. The Eighth Circuit found that the Baptist Convention played no role in the organization's governance; that the Baptist Convention did not appoint or approve any of the organization's board members; that the organization received no financial support from the Baptist Convention after its disassociation; and that the denominational requirement was limited to administrators, the president/CEO, chaplains, and board members. *Id.* at 653. This being so, there was insufficient evidence of common religious bonds and convictions between the entities.

Setting aside their uncertain derivation, the *Lown* factors cannot be the exclusive means of determining whether an organization is "associated with a church." This is because the *Lown* factors are much narrower than the broad language of the definition in § 1002(33)(C)(iv). Under the statute, to be "associated with a church," a corporation need only share "common religious bonds and convictions with that church or convention or association of churches." The statute imposes no denominational requirements, corporate governance requirements, or funding requirements. Thus, an organization could share

-14-

"common religious bonds and convictions" with a church while satisfying none of the *Lown* factors. Because the *Lown* factors are narrower than the statutory language, satisfying the *Lown* factors may *suffice* to establish that an organization is associated with a church. But an organization does not *need* to satisfy the *Lown* factors in order to be associated with a church.

We therefore do not rely on the *Lown* factors to reach our conclusion that CHI is associated with a Church. CHI's association with the Catholic Church is not a close question given the facts we recited above. Moreover, *Lown* and *Chronister* are easily distinguishable from the present case, since the healthcare organizations in *Lown* and *Chronister* had both officially disaffiliated from the Baptist Convention. Here, by contrast, CHI is regarded as an official part of the Catholic Church.

In sum, CHI's many connections to the Catholic Church suffice to satisfy the statutory requirement that CHI "share[] common religious bonds and convictions with" the Catholic Church.

### 2. Step Two: Is the Entity's Retirement Plan Maintained by a Principal-Purpose Organization?

As explained above, the church-plan exemption includes "a plan *maintained* by an *organization*, whether a civil law corporation or otherwise, the *principal purpose* or function of which is the administration or funding of" a

retirement plan for employees of a church or a nonprofit associated with a church. 29 U.S.C. § 1002(33)(C)(i) (emphases added).

The parties dispute which is the relevant "organization" for purposes of this provision: CHI as a whole, or the Subcommittee. They also dispute the meaning of "maintain" in this provision.

Medina argues that even if the Subcommittee "maintained the plan," it cannot be an "organization" in the statutory meaning. Because the Subcommittee is "a subcommittee of the HR Committee . . . which is a committee of the CHI Board," and CHI pays the Subcommittee's expenses, indemnifies its members, and CHI staff lead Subcommittee meetings, argues Medina, it cannot be its own organization. Aplt. Br. at 56. It is just a part of a larger organization, not an organization itself.

Medina also argues the CHI plan cannot qualify for the exemption because it is "maintained" by CHI, whose principal purpose is healthcare, not the administration or funding of the CHI plan. Medina concedes the Subcommittee "administers" the CHI plan, Aplt. Br. at 53, but argues CHI "maintains" it. Medina insists that "maintain" and "administer" are different terms under ERISA, and that "maintaining" a plan necessarily includes the power to modify or terminate it. That being so, Medina argues only CHI can be considered to "maintain" the plan. Finally, Medina insists that "[t]o 'maintain' a plan 'means to "continue" a plan.'" Aplt. Br. at 53 (quoting *Anderson v. UNUM Provident*

-16-

*Corp.*, 369 F.3d 1257, 1265 (11th Cir. 2004)).  She further explains that "to continue a plan requires the ability to modify or terminate it."  *Id.* (citing *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 449 (5th Cir. 1995)).[3]

We have not previously addressed the meaning of "maintain" under this or any other provision of ERISA.  And nowhere does ERISA define "maintain."  "When a term goes undefined in a statute, we give the term its ordinary meaning."  *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).  Dictionary definitions can help us determine that ordinary meaning.  *See, e.g.*, *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1231 (10th Cir. 2016).

*Black's Law Dictionary* provides several definitions for "maintain."  The definition most relevant in this context is "[t]o care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep."

---

[3] In support of her position, Medina points to *Anderson*, from the Eleventh Circuit, which looks to the dictionary definition of "maintain:"

> To "maintain" a plan, in the ordinary meaning of the word, simply means to "continue" a plan. *See* Webster's Third New International Dictionary 813 (1961) (defining "maintain" as "1: to keep in a state of repair, efficiency, or validity" or "4: to provide for: bear the expense of"); Black's Law Dictionary (7th ed. 1999) (defining "maintain" as "1. to continue").

*Anderson*, 369 F.3d at 1265.  She also points to *Hightower*, which, however, does not define "maintain" in the way she proposes.  65 F.3d 443.  Medina thus points to no authority explaining why "maintaining" a plan necessarily includes the power to modify or terminate it.

-17-

*Black's Law Dictionary* 1039 (9th ed. 2009). *Webster's* similarly defines

"maintain" as "to keep in a state of repair, efficiency, or validity" or

to provide for: bear the expense of." *Webster's Third New International*

*Dictionary* 1362 (2002).

And consider the following examples, culled from across the U.S. Code:

- ERISA requires an employer to "*maintain* records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C. § 1059(a)(1) (emphasis added). This provision cannot mean that employers have the power to "terminate" the relevant records. It must mean, as *Webster's* says, "to keep in a state of validity."

- Federal law requires the Secretary of the Air Force to "*maintain* a retired list containing the name of each retired commissioned officer of the Regular Air Force." 10 U.S.C. § 8966(a) (emphasis added). This provision cannot mean the Secretary of the Air Force can decide at will not to keep track of retired Air Force officers. It must mean, as *Webster's* says, "to keep in a state of validity."

- Federal law requires the Secretary of Homeland Security to "establish an importer of record program to assign and *maintain* importer of record numbers." 19 U.S.C. § 4320(a) (emphasis added). This provision cannot mean that the importer of record program can decide not to keep track of importer of record numbers at will. It must mean, as *Webster's* says, "to keep in a state of validity."

We could easily multiply these examples. The point is that Medina's view that

"maintain" must include the power to terminate or modify is contrary to the

term's ordinary usage, as evidenced by dictionaries and by its frequent use in the

U.S. Code.

-18-

In our view, then, when ERISA says that a church plan includes a plan "maintained" by a principal-purpose organization, 29 U.S.C. § 1002(33)(C), it simply means the principal-purpose organization, as *Black's* says, "cares for the plan for purposes of operational productivity."[4]  And this is precisely the point of the Subcommittee.

In fact, the CHI plan expressly delegates the power to "maintain" the plan to the Subcommittee.  *See* App., Vol. IV, at 934 ("The HR Committee of the Board of Stewardship Trustees of [CHI] has primary responsibility for the *maintenance* and compliance under the Plan and has fully and completely delegated those responsibilities to [the Subcommittee] . . .") (emphasis added), *id.* ("[T]he purpose of the [Subcommittee] shall be to provide for the proper operation, administration and *maintenance* of the Plan . . .") (emphasis added).  And the Subcommittee has used that power, for example, to amend the plan.  *See, e.g.*, App., Vol. IV at 1067 (explaining that CHI has delegated power to amend the plan to the Subcommittee, and amending the definition of "spouse" in the plan to include spouses of the same sex as the plan participant).

We also conclude CHI and the Subcommittee qualify as "organizations." *Black's* defines an organization as "[a] body of persons (such as a union or a corporation) formed for a common purpose." *Black's Law Dictionary*, at 1210.

---

[4]  But we take no position today on what "maintain" might mean in other provisions of ERISA, where context may present a different answer.

-19-

*Webster's* defines an organization as "a group of people that has a more or less constant membership, a body of officers, a purpose, and usu[ally] a set of regulations." *Webster's Third*, at 1590. Medina provides no authority for her argument that the Subcommittee cannot be an organization. *See* Aplt. Br. 55–57. On the contrary, the Subcommittee satisfies the dictionary definitions. The Subcommittee Charter describes the common purpose: "provid[ing] for the proper operation, administration and maintenance of the Plan and the underlying Code Section 501(a) Master Trust . . . ." App., Vol. IV at 934. It also sets forth regulations. *See* App., Vol. IV at 934–940. There is a body of officers: a Chair and four or five voting members. App., Vol. IV at 934. And nothing indicates the membership of the Subcommittee has not been "more or less constant." Medina thus fails to persuade us that the Subcommittee cannot be an "organization" within the meaning of the statute.

Medina's arguments are, moreover, contrary to common sense. "A textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored." Antonin Scalia & Bryan A. Garner, *Reading Law* 63–65 (2012). If we accept Medina's view of the statute, virtually no plan administered by a benefits committee or similar organization could qualify for the church-plan exemption. Medina would only allow the exemption for wholly independent bodies, constituted with the principal purpose of administering or funding a retirement plan, and endowed with the power to

-20-

modify or terminate that plan. Medina does not explain what this organizational structure would look like. If the principal-purpose organization administering the plan cannot be part of the organization whose employees the plan is intended to benefit, a religiously-affiliated entity would have to create a separate entity just to administer the plan. So, hypothetically, an entity called Religious Healthcare Corp. would have a plan to benefit its employees, but Religious Healthcare Corp. would have to create a separate, self-funded, wholly independent Pension Corp. to administer its plan. What is more, under Medina's theory, Religious Healthcare Corp. could not choose the board of Pension Corp., and Pension Corp. would need the power to terminate Healthcare Corp.'s retirement plan at any time, without needing to consult with Healthcare Corp. There may be some organization out there that is structured like that, but it certainly is not the most intuitive way to do it. And it is not clear what the advantage of such a structure would be, or why Congress would have required it.

We see no reason to follow Medina and require principal-purpose organizations to be organizations independent of the parent entity, endowed with the power to terminate benefit plans. No authority compels us to bar organizations from constituting subsidiary committees to administer their church plans.[5]

_____

[5] Given the lack of authority supporting Medina's arguments, we do not think it necessary to discuss the deference owed under *Skidmore v. Swift & Co.*,

(continued...)

We therefore find the Subcommittee is a principal-purpose "organization" in the meaning of the statute, and that it "maintains" the CHI plan.

### 3. Step Three: Is the Principal-Purpose Organization Associated with a Church?[6]

If CHI is associated with the Catholic Church, it follows that the Subcommittee—a subdivision of CHI—is as well.

First, as a matter of logic, a subdivision wholly encompassed by a larger entity shares that entity's affiliations. Medina herself argues the Subcommittee is so closely affiliated with CHI that it is not even a separate organization. Aplt. Br. at 55–57. Although we disagree with her definition of "organization," we take her point about the close relationship between the two entities.

Second, the Subcommittee's bonds with the Catholic Church are made clear by the plan documents. The plan's operating rules state that the Subcommittee

---

[5](...continued)
323 U.S. 134 (1944), to the agencies tasked with administering ERISA. As the Supreme Court did in *Advocate*, we are able to resolve this question solely by recourse to the language and internal logic of the statute.

[6] As we noted at oral argument, Medina failed to argue in her opening brief that the Subcommittee was not associated with a church. Oral Arg. at 23:25–24:25. Although obliquely raised in her reply brief, "issues raised by an appellant for the first time on appeal in a reply brief are generally deemed waived." *Wheeler v. Comm'r*, 521 F.3d 1289, 1291 (10th Cir. 2008). We could therefore resolve this issue in favor of CHI on waiver grounds. But waiver is a discretionary doctrine, so we go ahead and more fully explain our reasoning for the benefit of the parties. *See, e.g.*, *Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013) ("[T]he decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary.").

"shall be mindful of the Employer's Philosophy and Mission, and the teachings and tenets of the Roman Catholic Church and of the Sponsoring Congregations of Catholic Health Initiatives. The [Subcommittee] shares common religious bonds with the Roman Catholic Church and the Sponsoring Congregations of Catholic Health Initiatives." App., Vol. V at 1149, § 12.2. Although not necessarily dispositive, we note this is precisely the language the statute uses to define what it means to be associated with a church. *See* 29 U.S.C. § 1002(33)(C)(iv) ("An organization . . . is associated with a church or a convention or association of churches if it *shares common religious bonds* and convictions with that church or convention or association of churches." (emphasis added)).

Again, we need not decide today the precise scope of what it means to be "associated with" a church—we agree with the district court that the Subcommittee qualifies.

### 4. Propriety of Summary Judgment

Summary judgment is proper if the movant can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Medina argues the existence of genuine disputes of material fact render summary judgment improper at this stage.

She suggests two such disputes.

First, she suggests there is a genuine dispute of material fact as to whether CHI is "associated with" a church. Aplt. Br. at 68–71. But this is merely a

-23-

repackaging of Medina's legal argument that CHI does not qualify for ERISA's church-plan exemption. For the reasons explained above, we agree with the district court's resolution of this issue.

Second, she argues the district court erred in concluding that "substantially all" plan participants were employed by a permissible entity. Aplt. Br. at 71–73. To qualify for the church-plan exemption, "substantially all of the individuals included" in a church plan must be deemed employees of a church. 29 U.S.C. § 1002(33)(B)(ii). (That is, employees of a church or employees of a tax-exempt nonprofit associated with a church. *Id.* § (C)(ii)(II).) Before the district court Medina argued the plan includes "more than an insubstantial number of employees of organizations not associated with a church," rendering it ineligible for the exemption. Aplt. Br. at 72. The district court disagreed, and Medina now argues there is a genuine factual dispute here precluding summary judgment. Aplt. Br. at 72.

The parties agreed before the district court that "substantially all" in this context is satisfied if at least 85% of covered employees are deemed employees of a church. App., Vol. III at 653. They rely on *Cont'l Can Co. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund*, 916 F.2d 1154, 1158–60 (7th Cir. 1990), which noted that IRS regulations always interpret "substantially all" in the Internal Revenue Code as 85%, and interpreted "substantially all" in the Multiemployer Pension Plan Amendments Act of 1980 in

-24-

the same way. Without deciding the exact meaning of "substantially all" in 29 U.S.C. § 1002(33)(B)(ii)—for example, whether 75% would be enough—we accept Medina's concession that 85% would satisfy the statutory requirement.

According to Medina, over 25% of plan participants work for an organization called Centura Health. Aplt. Br. at 72 (citing App., Vol. IV at 1016–17). Medina cites deposition testimony from CHI's Executive Vice President of Mission, who stated that Centura Health was primarily a "management company" that "manages a Catholic arm and an Adventist arm." App., Vol. VII at 1680. Another manager stated that Centura was not required to accept the Ethical and Religious Directives for Catholic Health Care Services. App., Vol. VII at 1690–91.

This argument, however, does not get Medina very far. "[A]n issue of material fact is genuine only if the nonmovant presents facts such that a reasonable [factfinder] could find in favor of the nonmovant." *Planned Parenthood of the Rocky Mountains Servs. v. Owens*, 287 F.3d 910, 916 (10th Cir. 2002). As the district court explained,

> Centura is a joint venture between CHI and Adventist Health System Sunbelt Healthcare Corporation . . . another church-affiliated hospital system. Centura's two sole corporate members are Catholic Health Initiatives Colorado . . . which is 100 per cent controlled by CHI, and PorterCare Adventist Health System ("PorterCare"), which is 100 per cent controlled by Adventist Health. Both CHIC's and PorterCare's facilities are tax exempt, and each operates in accordance with the teachings of its respective founding church.

App., Vol. IV at 654.  On appeal, Medina does not dispute the district court's findings that Centura is a joint venture between CHI and Adventist, or that both are church-affiliated and operate in accordance with the teachings of their respective founding churches.

ERISA does not require that all entities covered by a church plan be associated with or controlled by a *single* church.  Medina argues "the statute precludes the conclusion that entities *associated* with different denominations can be included in a single church plan, since 'associated' requires 'shar[ing] common religious bonds and convictions.'"  Aplt. Br. at 73 (quoting 29 U.S.C. § 1002(33)(C)(iv)).  CHI, on the other hand, argues there is no such requirement in ERISA, and that IRS regulations allow the organizational structure at issue.  Aple. Br. at 52–54.

The district court, reviewing the record, agreed with CHI—and so do we.

We look first at the statutory language.  Section 1002(33)(B)(ii) provides that a "church plan" does not include a plan "if less than substantially all of the individuals included in the plan are individuals described" in 29 U.S.C. § 1002(33)(A) or (C)(ii).  Section 1002(33)(A) refers to employees of a church or convention or association of churches; (C)(ii) refers to employees of tax-exempt nonprofit organizations associated with a church or a convention or association of churches.  To put the point simply, then, a church plan does not include a plan if

less than substantially all those covered are deemed employees of a church or associated organization.

The plain language thus allows the type of structure Centura has. To paraphrase the statute, it says "a church plan does not include a plan where fewer than 'substantially all' of the covered individuals are employees of a church." Changing "of a church" to "of the same church" or even of "the church" might support Medina's reading. But the natural reading of the statute is that a plan is acceptable as long as "substantially all" the covered employees are deemed employees of "some" church. And the relevant question is not whether "substantially all" the covered employees share "common religious bonds and convictions" with each other, as Medina would have it, but whether they share "common religious bonds and convictions" with some church.

The IRS's 2002 Private Letter Ruling exempting CHI noted that only 1.64% of plan participants were employed by non-tax-exempt entities. App., Vol. VI at 1397. It is, moreover, CHI's policy that less than 5% of the plan's participants work for employers that are not tax-exempt church-controlled entities. Medina disputes neither of these points, thus waiving any potential counterargument.

We therefore find no genuine dispute of material fact as to whether substantially all of the plan participants are deemed employees of a church.

## 5. *Conclusion*

We therefore find CHI's plan satisfies the statutory requirements for the church-plan exemption. To reiterate, the statutory inquiry is threefold. We find CHI is a tax-exempt organization associated with a church. We find the Subcommittee's principal purpose is maintaining a retirement plan for the benefit of CHI employees. We find the Subcommittee is also associated with a church. We find no genuine disputes of material fact precluding summary judgment. This being so, we find CHI's plan qualifies for the church-plan exemption.

## B. *Establishment Clause Challenge*

Finally, we address Medina's argument that granting a church-plan exemption to CHI would violate the Establishment Clause of the First Amendment.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. 1. To assess an Establishment Clause challenge, we follow the tripartite test from *Lemon v. Kurtzman*, 403 U.S. 602 (1971). As we have explained,

> government action does not violate the Clause if (1) it has a secular purpose; (2) its principal or primary effect is one that neither advances nor inhibits religion; and (3) it does not foster an excessive government entanglement with religion. We interpret the first and second prongs of the *Lemon* test in light of Justice O'Connor's endorsement test. That is, we ask whether government's actual purpose is to endorse or disapprove of religion, and whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. We evaluate the government's actions

from the perspective of a reasonable observer who is aware of the history, purpose, and context of the act in question.

*Fields v. City of Tulsa*, 753 F.3d 1000, 1010 (10th Cir. 2014) (citations omitted) (quotations and alterations incorporated). The test is conjunctive: failing any prong of the *Lemon* test means that the government action cannot withstand Establishment Clause scrutiny. We therefore consider each prong separately.

In First Amendment cases, we examine "constitutional facts" de novo. *Felix v. City of Bloomfield*, 841 F.3d 848, 853 (10th Cir. 2016). "When the dispute concerns an alleged Establishment Clause violation, 'constitutional facts' are the 'district court's findings on each part of the *Lemon* test.'" *Id.* (quoting *Green v. Haskell Cty. Bd. Of Comm'rs*, 568 F.3d 784, 795–96 (10th Cir. 2009)). We therefore owe no deference to the district court's constitutional analysis.

### 1. Purpose

"The question presented by the first prong of the *Lemon* test . . . is 'whether the government conduct was motivated by an intent to endorse religion.'" *Am. Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1118 (10th Cir. 2010) (quoting *Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1030 (10th Cir. 2008)). "In deciding whether the government's purpose was improper, a court must view the conduct through the eyes of an 'objective observer,' one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act." *Weinbaum*, 541 F.3d

at 1031 (quotations omitted). "We will not lightly attribute unconstitutional motives to the government, particularly where we can discern a plausible secular purpose." *Id.* (quotation and alteration incorporated).

There is a plausible secular purpose here, as the district court found. First, nothing in the text evinces an intent to favor one or all religions. The legislative history, moreover, indicates Congress wanted to avoid unnecessary entanglement with religion when it expanded ERISA's church-plan exemption. *See* 125 Cong. Rec. 10,052 (1979) (statement of Sen. Talmadge) ("If we have enacted a statute that may require the church plans to come under ERISA, file reports, be subject to the examination of books and records and possible foreclosure of church property to satisfy plan liabilities, it must be changed because we have clearly created an excessive Government entanglement with religion."); 125 Cong. Rec. 12,106-07 (1978) (statement of Rep. Conable) (explaining that "when we enacted [ERISA], we exempted church plans from the provisions of the act to avoid excessive Government entanglement with religion in violation of the [F]irst [A]mendment to the Constitution," and that ERISA should be amended to account for different organizational structures).

We share the Supreme Court's concern that these "excerpts from committee hearings and scattered floor statements by individual lawmakers" are "'among the least illuminating forms of legislative history.'" *Advocate*, 137 S. Ct. at 1661 (quoting *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 943 (2017)). But we are not

historians searching for absolute truth.  We find the purpose of avoiding

government entanglement with religious organizations to be plausible, which is

all that is required in this context.  Moreover, Medina's briefing does not suggest

any other purpose the statute might have.  *See* Aplt. Br. at 59–64 (discussing the

first prong of the *Lemon* test).  Yet it is her burden to do so.  *See Am. Atheists*,

637 F.3d at 1118 & n.10.

Nor do we see any reason to conclude this explanation is so implausible

that there must actually have been a religious purpose.  *Am. Atheists*, 637 F.3d at

1118.

And we find that this purpose—avoiding entanglement with religion—is a

secular one.  A contrary conclusion would be illogical—it would place the

government in a double-bind.  The government could not constitutionally pass a

law to avoid entanglement, but then the entanglement would run afoul of the

Constitution.  And the Supreme Court has expressly held that a purpose of

avoiding government entanglement does not violate the Establishment Clause.

*See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v.

Amos*, 483 U.S. 327, 335 (1987) ("Under the *Lemon* analysis, it is a permissible

legislative purpose to alleviate significant governmental interference with the

ability of religious organizations to define and carry out their religious

missions.").

We therefore find the first prong of the *Lemon* test satisfied.

## 2. *Effect*

We next consider whether the church-plan exemption violates the second prong of the *Lemon* test. It is permissible government action only if its principal or primary effect is one that neither advances nor inhibits religion. As we explained above, our circuit interprets the effect prong of *Lemon* in light of Justice O'Connor's endorsement test. We therefore ask more specifically whether the challenged conduct has "the effect of conveying a message that religion or a particular religious belief is favored or preferred." *Weinbaum*, 541 F.3d at 1030 (quoting *Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 551 (10th Cir. 1997)). The effect prong "looks through the eyes of an objective observer," aware of the "purpose, context, and history" of the government action in question, "kin to the fictitious 'reasonably prudent person' of tort law." *Id.* at 1031.

Medina argues exempting religious hospital systems from ERISA conveys a message that religion is favored. She also argues CHI's exemption favors religious adherents at the expense of nonadherents, because nonadhering participants in the CHI plan do not receive the disclosures required by ERISA, their benefits are not insured by the Pension Benefit Guaranty Corporation, and because it takes longer for participants' right to benefits to vest than it would in an ERISA-compliant plan.

But Supreme Court precedent forecloses Medina's argument. In *Amos*, 483 U.S. 327, the Supreme Court considered a challenge to a section of the Civil

Rights Act that exempted religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion. Even though the challenged provision exempted religious organizations from an otherwise applicable law, the Supreme Court held that it did not run afoul of the second prong of the *Lemon* test. The Court explained that

> it has never indicated that statutes that give special consideration to religious groups are *per se* invalid. That would run contrary to the teaching of our cases that there is ample room for accommodation of religion under the Establishment Clause. Where, as here, government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption comes packaged with benefits to secular entities.

*Id.* at 338 (citation omitted). We do not find the present case distinguishable.

Consider the issue from first principles. Any law of general applicability that exempts religious organizations from its requirements could be said to convey a message that religion is favored. Religion is, after all, being exempted from a rule everyone else has to follow. Such an approach would mean that Congress could never exempt religious organizations from laws that might burden them—even when burdening religious organizations would itself run afoul of the Constitution. But this is common practice. A number of statutes regulate wide swathes of the American economy. And many of these statutes expressly exempt religious organizations from various requirements. Apart from ERISA's church-plan exemption, examples include the Internal Revenue Code, 26 U.S.C. §§ 6033(a)(3)(A)(i), (iii) (carving out "churches, their integrated

-33-

auxiliaries, . . . conventions or associations of churches," and "the exclusively religious activities of any religious order" from a tax-filing requirement); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1(a) (exempting religious organizations from religious-discrimination claims); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12113(d) (exempting religious organizations from anti-discrimination requirements), *id.* § 12187 (exempting religious organizations from public accommodation requirements); and likely many others besides. Accepting Medina's argument that accommodation equals favoritism would wreak havoc to these schemes. And a unanimous Supreme Court has cautioned that courts of appeals misconstrue Supreme Court precedent if they read it so that "all manner of religious accommodations would fall." *Cutter v. Wilkinson*, 544 U.S. 709, 724 (2005).

Moreover, without the rule in *Amos* we would be in a position that might require us to strike down religious-accommodation provisions in a number of regulatory statutes, such as the ones cited in the previous paragraph from the Internal Revenue Code, Title VII, and the Americans with Disabilities Act. And it would entail putting Congress between a rock and a hard place: we would not let them exempt religious organizations from regulatory requirements, but we also would not let Congress *subject* organizations to onerous regulatory requirements. *See, e.g.*, *NLRB v. Catholic Bishop*, 440 U.S. 490 (1979) (construing the National Labor Relations Act to remove the NLRB's jurisdiction over schools operated by

churches to avoid constitutional difficulties). To paraphrase Voltaire, then, if *Amos* did not exist, we would have to invent it.[7]

We therefore find that ERISA's church-plan exemption does not have the principal or primary effect of advancing religion. Or, phrased in terms of Justice O'Connor's endorsement test, exempting religious organizations from complying with a regulatory scheme does not convey an impermissible message that religion is favored or preferred. Indeed, Justice O'Connor herself wrote separately in *Amos* to express her view that an accommodation of the exercise of religion is not a government endorsement of religion. *Amos*, 483 U.S. at 349 (O'Connor, J., concurring). And that is precisely what ERISA's church-plan exemption provisions do.

### 3. Entanglement

Finally, the *Lemon* test asks whether the government action fosters an excessive government entanglement with religion. Medina argues the church-plan exemption entangles government in religion because it requires courts and agencies to determine whether CHI is "associated with" a church. CHI, on the other hand, argues *applying* the church-plan exemption would foster entanglement. We agree with CHI.

---

[7] *Cf.* Voltaire, Letter to the Author of the Book of the Three Impostors, quoted in *Bartlett's Familiar Quotations* 310 (Justin Kaplan gen. ed., 16th ed. 1992) ("If God did not exist, it would be necessary to invent him.")

We have difficulty imagining how this area of the law would function if merely determining whether an organization is a religious organization, or associated with one, constituted impermissible entanglement. How would a church exercise its many constitutional and statutory rights if agencies and courts could not assess whether it was, in fact, a church?

On the other hand, we are persuaded that subjecting religious organizations to ERISA would foster impermissible entanglement.

If we took Medina's argument for all it is worth, then we would have to subject religious organizations to ERISA. And that would foster even greater entanglement. As the district court noted, "[e]nsuring ongoing ERISA compliance by church-associated entities undoubtedly would require long-term, continuing monitoring not involved in the relatively time-delimited analysis of a claim of entitlement to the exemption." App., Vol. III at 658. Complying with ERISA's fiduciary rules is no simple matter. A Catholic church, or entity associated with one, might want to invest its plan assets in service of certain social goals. But that could run afoul of ERISA, which requires diversification of plan assets, 29 U.S.C. § 1104(a)(1)(C), and that plan assets be held for the exclusive purpose of providing benefits and defraying reasonable plan expenses. 29 U.S.C. § 1103(c). There would, moreover, be pervasive monitoring to determine whether the church or church-associated entity was complying with ERISA.

If we merely invalidated the portion of ERISA extending the church-plan exemption to entities "associated with a church," then ERISA would require religious organizations, in order to receive the exemption's benefits, to adopt a particular structure, thus interfering in the internal organization of a religious institution. And that is precisely what Supreme Court precedent forbids: the Religion Clauses jurisprudence "radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 186 (2012) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952)).

We therefore find that, far from entangling the government in the affairs of religious institutions, the church-plan exemption avoids the entanglement that would likely occur in its absence.

*    *    *

Finding the church-plan exemption survives all three prongs of the *Lemon* test, we reject Medina's argument that exempting CHI from ERISA runs afoul of the Establishment Clause.

## III. Conclusion

For the reasons above, we AFFIRM the district court's grant of summary judgment.