# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2709

_____

Geoffrey Varga, in his capacity as Official Liquidator of Palm Beach Offshore, Ltd., and Palm Beach Offshore II, Ltd.

*Plaintiff - Appellant*

v.

U.S. Bank National Association

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: June 11, 2014
Filed: August 21, 2014

_____

Before LOKEN, BEAM, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Geoffrey Varga, in his capacity as the official liquidator of Palm Beach Offshore, Ltd. and Palm Beach Offshore II, Ltd. (collectively, "the Palm Beach Funds"), sued U.S. Bank National Association ("U.S. Bank") for aiding and abetting a breach of fiduciary duty, willful and wanton negligence, and gross negligence. These claims arose from the Palm Beach Funds' investment through accounts

maintained at U.S. Bank in what turned out to be a Ponzi scheme. The district court[1] granted U.S. Bank's motion to dismiss Varga's amended complaint. Varga appeals, and we affirm.

## I.    Background

In this appeal from the grant of a motion to dismiss, we accept as true the well-pleaded allegations in the amended complaint. *Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 742 F.3d 845, 854 (8th Cir. 2014).

Tom Petters, through his company Petters Company, Inc. ("Petters Company"), claimed to purchase excess consumer merchandise, such as electronics, from vendors. Petters Company financed these supposed transactions by selling high-yield promissory notes to investors through Petters Capital, Inc. ("Petters Capital"), a wholly owned entity of Petters Company. These promissory notes were to be repaid once the consumer merchandise had been sold to and paid for by retailers, like Sam's Club and BJ's Wholesale Club, in transactions that Petters Company was to arrange. This investment structure enabled Petters Company to grow into what appeared to be a multi-billion dollar operation. But the investment scheme peddled by Petters Company was entirely illusory: no vendors ever sold consumer merchandise, and no retailers ever purchased it. Instead, Petters Company generated fake purchase orders and sales confirmations and kept its scheme afloat by recycling funds that it received from new investors to pay off the promissory notes of old investors as they came due. The inevitable collapse of Petters's Ponzi scheme caused investors to suffer staggering losses.

---

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

The Palm Beach Funds, which invested in Petters Company's promissory notes and are now being liquidated, collectively lost over $700 million to Petters's scheme. The Palm Beach Funds' investment was made through another fund called Palm Beach Finance Partners II, LP ("Palm Beach Finance"). Palm Beach Finance received the Palm Beach Funds' investment in Petters Company's promissory notes via an escrow account that was maintained at U.S. Bank and was governed by an escrow-account agreement.

What happened to the Palm Beach Funds' money once it was transferred out of the escrow account forms the heart of this case. The money initially went to a collateral account that also was maintained at U.S. Bank. The collateral account was governed by a collateral-account agreement to which U.S. Bank, Palm Beach Finance, and Petters Capital, among others, were parties. The Palm Beach Funds were not parties to the collateral-account agreement. Once the Palm Beach Funds' investment reached the collateral account, Varga alleges that a "direct payment system" prescribed that (a) outgoing funds from the collateral account were to be sent directly to the vendors that purportedly sold the consumer merchandise to Petters Company and (b) incoming funds to the collateral account were to come directly from the retailers that purportedly purchased the consumer merchandise from Petters Company. This direct payment system, according to Varga, was designed to prevent a third party from accessing investor funds and to ensure the legitimacy of the merchandise transactions. Because no vendors or retailers were involved in any legitimate transactions, the direct payment system was never followed. Instead, the collateral account played host to the Ponzi scheme with the outgoing funds being sent to Petters Company through sham inventory vendors and the incoming funds (i.e., the investors' recycled funds) coming from Petters Company.

Varga alleges that Bruce Prevost and David Harrold, in their capacity as directors of the Palm Beach Funds, breached their fiduciary duties to the Palm Beach Funds. Varga additionally alleges that Palm Beach Capital Management, LLC

("PBCM"), which managed the Palm Beach Funds, breached its fiduciary duties to the Palm Beach Funds. In particular, Varga argues that Prevost, Harrold, and PBCM breached their fiduciary duties to the Palm Beach Funds by failing to ensure that the direct payment system was utilized while nonetheless continuing to invest in Petters Company's promissory notes and by concealing the noncompliance with the direct payment system from the Palm Beach Funds. Varga settled his claims against Prevost, Harrold, and PBCM in a separate proceeding.

This case concerns Varga's further claim that U.S. Bank's actions are sufficient to charge it with aiding and abetting the breach of fiduciary duty by Harrold, Prevost, and PBCM, willful and wanton negligence, and gross negligence. Varga alleges that U.S. Bank knew that the direct payment system was not being followed. Varga further asserts that U.S. Bank understood that the direct payment system was an important procedural safeguard that was designed to protect the Palm Beach Funds' investment. U.S. Bank acquired this knowledge, according to Varga, by reviewing the collateral-account agreement, the Palm Beach Funds' marketing and due-diligence documents, and the private offering memoranda for the Palm Beach Funds' investment in Petters Company's promissory notes.

In addition to appreciating the importance of the direct payment system, Varga alleges that U.S. Bank participated in concealing from the Palm Beach Funds the fact that the direct payment system was not being followed. Varga first alleges that U.S. Bank participated in a so-called "re-coding scheme" at the direction of two of the "fund managers" for the Palm Beach Funds—identified in Varga's brief as Prevost and Harrold. This alleged scheme, which began no later than December 2006, involved U.S. Bank re-coding the account statements for the collateral account to indicate that the incoming funds into the collateral account were being received from retailers, not Petters Company. However, Varga admits in his amended complaint that, from 2002 until the re-coding scheme began in approximately December 2006, the collateral account statements correctly listed Petters Company as the source of the

-4-

incoming funds. According to Varga, U.S. Bank also told various individuals associated with the Palm Beach Funds that the direct payment system was being followed. The amended complaint includes only one example of this alleged practice. Varga alleges that Jonathan Spring, a third-party marketer for the Palm Beach Funds and an investor in Petters Company's promissory notes, contacted U.S. Bank employee Thomas Caruth. Caruth, who was Palm Beach Finance's "main contact" at U.S. Bank, told Spring that "all wires sent out of U.S. Bank go directly to retailers and manufacturers" and "wires received come directly from retailers without going through intermediaries."

On the basis of these allegations, Varga sued U.S. Bank. U.S. Bank moved to dismiss the amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The district court granted U.S. Bank's motion. This appeal followed.

## II.    Discussion

We review *de novo* the grant of a motion to dismiss, accepting the well-pleaded allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff. *Id.* In addition to the allegations in the amended complaint, we also may consider "materials that are necessarily embraced by the pleadings." *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**A.    Aiding and Abetting a Breach of Fiduciary Duty**

Under Minnesota law, aiding and abetting the tortious conduct of another has three elements: "(1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach." *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999).  While the parties dispute whether Varga alleged a breach of fiduciary duty by Prevost, Harrold, and PBCM, we assume for purposes of this appeal that Varga has done so.  Varga's aiding-and-abetting claim nonetheless fails because he has not alleged plausibly that U.S. Bank knew that Prevost, Harrold, and PBCM's conduct constituted a breach of fiduciary duty or that U.S. Bank substantially assisted that breach of fiduciary duty.

An aider and abettor's knowledge that the primary tortfeasor's conduct constitutes a breach of fiduciary duty is a "crucial element" of a claim for aiding and abetting.  *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012) (quoting *Fed. Deposit Ins. Corp. v. First Interstate Bank of Des Moines, N.A.*, 885 F.2d 423, 431 (8th Cir. 1989)) (applying Minnesota law).  Knowledge is evaluated "in tandem" with the requirement that the aider and abettor substantially assist the breach of a fiduciary duty.  *Witzman*, 601 N.W.2d at 188 (quoting *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1495 (8th Cir. 1997)).  Consequently, "where there is a minimal showing of substantial assistance, a greater showing of scienter is required."  *Id.* (quoting *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991)).  Factors that are relevant to whether knowledge and the requisite degree of assistance exist include "the relationship between the defendant and the primary tortfeasor, the nature of the primary tortfeasor's activity, the nature of the assistance provided by the defendant, and the defendant's state of mind."  *Id.*

Varga relies on three allegations in the amended complaint to support his argument that he plausibly pled that U.S. Bank knew of and substantially assisted a breach of fiduciary duty. First, Varga asserts that U.S. Bank's review of various documents that purportedly mandated the direct payment system suffices to establish U.S. Bank's knowledge that Prevost, Harrold, and PBCM were breaching their fiduciary duties to the Palm Beach Funds by failing to ensure that the direct payment system was utilized while nonetheless continuing to invest in Petters Company's promissory notes. The documents alleged to have been reviewed by U.S. Bank include: the collateral-account agreement; the private offering memoranda for the Palm Beach Funds' investment in Petters Company's promissory notes; and the Palm Beach Funds' marketing and due-diligence documents. However, the collateral-account agreement, which established U.S. Bank's duties in relation to the collateral account, does not mandate that U.S. Bank only accept those deposits that come from retailers.[2] To the contrary, the collateral-account agreement expressly contemplates instances in which the direct payment system would not be followed. In particular, the collateral-account agreement provides that U.S. Bank "shall . . . [a]pply and credit for deposit to the Collateral Account . . . all Collections [defined as "all payments owing to [Petters Capital] with respect to sales of inventory"] and other Receipts from time to time tendered by or on behalf of [Petters Capital] for deposit therein." As this excerpt makes clear, not only did the collateral-account agreement indicate that exceptions to the direct payment system may be made, but it also left U.S. Bank with no discretion to refuse the aforementioned deposits that were made "by or on behalf of" Petters Capital, a wholly owned entity of Petters Company. In light of this contractual provision in the collateral-account agreement, it is implausible to conclude that U.S. Bank knew that the failure to adhere to the direct payment system

_____

[2]As noted above, when deciding a motion to dismiss, we may consider materials that necessarily are embraced by the pleadings. *See Mattes*, 323 F.3d at 697 n.4. During oral argument, Varga conceded that the collateral-account agreement, which was attached to U.S. Bank's motion to dismiss, is properly before us.

and continued investments in Petters Company's promissory notes constituted a breach of fiduciary duty by Harrold, Prevost, and PBCM. *See Iqbal*, 556 U.S. at 678.

Varga responds by pointing to other language in the collateral-account agreement—for example, that Petters Capital "agrees to direct each [retailer] to make all payments" to the collateral account. The private offering memorandum quoted in the amended complaint contains a similar statement. But an agreement that Petters Capital would "direct" the retailers, who were not parties to the collateral-account agreement, to make the deposits into the collateral account provides no indication of whether the retailers had agreed or would agree to this course of action. Varga also relies on the portion of the collateral-account agreement that states that Palm Beach Finance "has *requested* that . . . all collections received from [retailers] and proceeds of such inventory and accounts receivable be . . . remitted by wire transfer directly to" the collateral account. (emphasis added) However, the use of the word "requested" by Palm Beach Finance—the party through which the Palm Beach Funds' money flowed—indicates that no agreement had been reached on whether the direct payment system was, in fact, mandatory. *See* Webster's Third New International Dictionary 1929 (2002) (defining "request" as "to ask (as a person or an organization) for something"). Moreover, neither of the above-quoted provisions impose any duty on U.S. Bank to ensure that the retailers made their deposits directly into the collateral account. Consequently, far from mandating the direct payment system, the portions of the collateral-account agreement and the private offering memoranda on which Varga relies actually indicate that the direct payment system was not mandatory.

Varga also contends that U.S. Bank acquired knowledge of the breach of fiduciary duty from its review of the Palm Beach Funds' marketing and due-diligence materials. Because these documents are not before the court at this procedural juncture, Varga asserts that we must accept the truth of his allegation that these documents "required" the retailers to make deposits directly into the collateral account. Even if these documents did so state, they would be inconsistent with the

collateral-account agreement, the document that specified U.S. Bank's duties in relation to the collateral account. As noted above, by executing the collateral-account agreement, Palm Beach Finance and Petters Capital, among others, agreed to allow, and in fact required, U.S. Bank to accept incoming funds from a source other than a retailer. U.S. Bank is entitled to rely on the specific provisions in its contract in the face of alleged statements in ancillary documents, like the marketing and due-diligence documents at issue here, to determine what conclusion to draw from the fact that the direct payment system was not being followed. *Cf. Witzman*, 601 N.W.2d at 188 (providing that "the relationship between the defendant and the primary tortfeasor" as well as "the nature of the primary tortfeasor's activity" are permissible considerations when ascertaining defendant's knowledge of a breach of fiduciary duty). Therefore, Varga has not alleged plausibly that U.S. Bank knew from its review of the documents described above that Prevost, Harrold, and PBCM's actions constituted a breach of fiduciary duty to the Palm Beach Funds.

Second, Varga relies on his assertion that, no later than December 2006, U.S. Bank began re-coding the account statements for the collateral account to identify retailers, not Petters Company, as the source of the funds deposited into the collateral account. U.S. Bank, it is alleged, took this step at the direction of Prevost and Harrold. From these instructions, Varga contends that U.S. Bank inferred that Prevost, Harrold, and PBCM were breaching their fiduciary duties by wrongfully concealing the noncompliance with the direct payment system from the Palm Beach Funds. We disagree. The context within which the re-coding instructions to U.S. Bank were made is key. For approximately the previous four years—that is, from 2002 until about December 2006—the account statements correctly reported that Petters Company, not a retailer, made the deposits into the collateral account. Inferring a wrongful scheme to conceal the noncompliance with the direct payment system when this fact had been fully disclosed for approximately four years without any questions from the recipients of the account statements is simply not plausible. *See Iqbal*, 556 U.S. at 678. As the district court correctly summarized, under these

circumstances, "it is hard to understand why U.S. Bank should have understood [the re-coding] as a breach of fiduciary duty, 'somehow retroactively conceal[ing]' the source of the payments from the [Palm Beach Funds]." (second alteration in original).

Varga further contends that U.S. Bank's act of re-coding the account statements amounted to substantial assistance of a breach of fiduciary duty. In order to provide substantial assistance, "[t]he defendant must have some degree of knowledge that his actions are aiding the primary violator." *Camp*, 948 F.2d at 460; *see Witzman*, 601 N.W.2d at 188 (relying on *Camp* and explaining that "defendant's state of mind . . . come[s] into play" when determining whether conduct constitutes substantial assistance). "[S]ome element of blameworthiness" must be present in the defendant's assistance. *Camp*, 948 F.2d at 460. Consequently, conduct that inadvertently advances the breach of a fiduciary duty does not amount to substantial assistance. *Id.* While U.S. Bank's re-coding of the account statements might be consistent with a recognition that it was helping to mislead the recipients of the account statements or otherwise aiding a breach of fiduciary duty, Varga's allegations fail to raise more than a sheer possibility of misconduct. *See Iqbal*, 556 U.S. at 678 ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." (quoting *Twombly*, 550 U.S. at 556)); *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 717 (8th Cir. 2011) ("The facts pleaded . . . do not permit us to infer more than the mere possibility of misconduct. Thus, [the] complaint merely alleged, but did not show, that [plaintiff] is entitled to relief.").

Considering the facts as alleged by Varga, the only plausible inference to be drawn from U.S. Bank's re-coding of the account statements is that U.S. Bank simply was following a customer's directions for reporting the ultimate source of the incoming funds into the collateral account. When U.S. Bank agreed to re-code the account statements, it knew that the recipients of these statements had known for approximately four years that Petters Company was the source of the incoming funds into the collateral account. Moreover, the collateral-account agreement informed

U.S. Bank of the fact that Petters Capital, a wholly owned entity of Petters Company, may be depositing the funds that it received from the retailers into the collateral account. The collateral-account agreement also describes the incoming deposits to the collateral account as "all payments owing to [Petters Capital] with respect to the sales of inventory." Consequently, in the absence of further allegations about the substance of the re-coding instructions to U.S. Bank or any allegation about U.S. Bank's knowledge of how Prevost, Harrold, and PBCM intended to use the account statements, U.S. Bank could only plausibly understand that it was assisting its customer with reporting the ultimate source (retailers), rather than the intermediate source (Petters Company), of the incoming funds into the collateral account. Accordingly, Varga has not alleged plausibly that U.S. Bank inferred that it was assisting with any sort of concealment or otherwise furthering a breach of fiduciary duty by Prevost, Harrold, and PBCM. *See Iqbal*, 556 U.S. at 678.

Finally, Varga relies on his assertion that U.S. Bank employees falsely told individuals associated with the Palm Beach Funds that the direct payment system was being followed. Although Varga contends that misrepresentations like this occurred on multiple occasions, the amended complaint identifies only one specific instance: a misrepresentation by U.S. Bank employee Caruth to Spring, a third-party marketer for the Palm Beach Funds and an investor in Petters Company's promissory notes. Caruth was Palm Beach Finance's "main contact" at U.S. Bank. Varga primarily argues that Caruth's misstatement constitutes substantial assistance. However, Varga has not alleged that Caruth knew that his statement to Spring was false. Absent such an allegation, Varga's argument for substantial assistance necessarily fails. *See Camp*, 948 F.2d at 460 (explaining that defendant's conduct must have "some element of blameworthiness"); *E-Shops Corp.*, 678 F.3d at 664 ("There are no factual allegations that [the bank] knew the information it processed . . . [was] false at the time of receipt."); *see also Topchian v. JPMorgan Chase Bank, N.A.*, --- F.3d ---, 2014 WL 3703995, at *7 (8th Cir. July 28, 2014) ("The facts that [the plaintiff] has alleged might be consistent with [a bank executive] having known that his statement

-11-

was false, but the alleged facts are equally consistent with a scenario in which [the bank executive] fully and reasonably believed that his statement was true."). Moreover, even if we can infer that Caruth knew that his statement was false, there are no allegations from which we can infer that Caruth understood or even should have understood that his misstatement aided Prevost, Harrold, and PBCM's breach of fiduciary duty to the Palm Beach Funds. *See Camp*, 948 F.2d at 460 ("The defendant must have some degree of knowledge that his actions are aiding the primary violator.").

Varga's further assertion that, at unspecified times, unnamed U.S. Bank employees made misstatements to unnamed individuals associated with the Palm Beach Funds fares no better. Not only does Varga fail to allege that the unnamed U.S. Bank employees knew that their statements were false, but the amended complaint lacks any indication of whether these employees had access to records regarding the collateral account or whether they understood or even should have understood that their statements were aiding a breach of fiduciary duty by Prevost, Harrold, and PBCM. These allegations are therefore insufficient to state a plausible claim. *See C.N. v. Willmar Pub. Schs.*, *Indep. Sch. Dist. No. 347*, 591 F.3d 624, 634 (8th Cir. 2010) (rejecting allegations that misconduct occurred "on unspecified dates and under circumstances not described" because "[s]uch vague allegations neither provide [defendant] with fair notice of the nature of [plaintiff's] claims and the grounds upon which those claims rest nor plausibly establish [plaintiff's] entitlement to any relief"); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) ("[S]ome factual allegations may be so indeterminate that they require 'further factual enhancement' in order to state a claim." (quoting *Iqbal*, 556 U.S. at 678)).

Considering U.S. Bank's knowledge and assistance in tandem, s*ee Witzman*, 601 N.W.2d at 188, we agree with the district court that Varga has not stated a plausible claim. We consequently affirm the grant of U.S. Bank's motion to dismiss Varga's claim for aiding and abetting a breach of fiduciary duty.

-12-

**B.    Negligence**

Varga also brought claims against U.S. Bank for willful and wanton negligence and for gross negligence. In order to succeed on these claims, Varga must, among other things, allege the existence of a duty. *See Louis v. Louis*, 636 N.W.2d 314, 318 (Minn. 2001). Under Minnesota law, whether a duty exists is generally an issue of law. *See id.*

Varga asserts that U.S. Bank had a duty to provide information to the Palm Beach Funds about the flow of funds in and out of the collateral account. Varga bases this argument on *Klein v. First Edina National Bank*, 196 N.W.2d 619 (Minn. 1972) (per curiam), which held that when a bank transacts business with a customer, the bank "has no special duty to counsel the customer and inform him of every material fact relating to the transaction . . . unless special circumstances exist." *Id.* at 623. One such special circumstance is "where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him." *Id.*

Relying on *Klein*, Varga argues only that special circumstances existed here because U.S. Bank knew or had reason to know that the Palm Beach Funds placed their trust and confidence in U.S. Bank to counsel and inform them about whether the direct payment system was being followed. U.S. Bank knew or had reason to know of this reliance, Varga argues, based on the escrow-account agreement and the collateral-account agreement as well as U.S. Bank's role in the Palm Beach Funds' investment in Petters Company's promissory notes. The parties' contracts are of no help to Varga. Neither the escrow-account agreement, which defined U.S. Bank's duties to the Palm Beach Funds, nor the collateral-account agreement, which specifically disclaimed U.S. Bank's duties to third parties like the Palm Beach Funds, evidence the special circumstances contemplated by *Klein*. Moreover, as noted

above, the collateral-account agreement expressly required U.S. Bank to accept deposits that did not comply with the direct payment system.

Nor does the allegation that the Palm Beach Funds referred its investors and third-party marketers to U.S. Bank to have their questions about the escrow and collateral accounts answered establish the special circumstances contemplated by *Klein*. The relevant contracts establish what can only be described as an ordinary, arm's-length commercial relationship between U.S. Bank and the Palm Beach Funds, and "[c]ourts applying Minnesota law have been reluctant to impose a duty to disclose material facts in arm's-length business transactions between commercial entities." *Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 813 (Minn. Ct. App. 2010). Moreover, Varga has not referred us to any Minnesota case law, and we have not located any on our own, that imposes a duty on a bank to inform its customer of material information under circumstances that are remotely similar to those present here. Indeed, the primary case that Varga cites in favor of imposing such a duty—*Klein*—actually undermines his argument. The *Klein* court found that a bank did not have a duty to inform a customer of material information notwithstanding the twenty-year relationship between the bank and the customer. 196 N.W.2d at 623; *see Norwest Bank Hastings v. Clapp*, 394 N.W.2d 176, 179 (Minn. Ct. App. 1986) ("If [the *Klein* plaintiff's] twenty-year relationship with her banker was insufficient to establish reliance, certainly [meeting your banker twice and having one short meeting with him] was insufficient."). We thus affirm the grant of U.S. Bank's motion to dismiss Varga's negligence claims.

## III. Conclusion

For the reasons set forth above, we affirm.

_____

-14-