# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-3574

_____

Sally Sanzone, individually and behalf of all others similarly situated; Gene Grasle

*Plaintiffs - Appellants*

v.

Mercy Health; Mercy Health Benefits Committee

*Defendants - Appellees*

John Does, 1-10, Members of the Mercy Health Benefits Committee; Jane Does, 1-10, Members of the Mercy Health Benefits Committee

*Defendant*s

Mercy Health Stewardship Committee

*Defendant - Appellee*

John Does, 11-20, Members of the Mercy Health Stewardship Committee; Jane Does, 11-20, Members of the Mercy Health Stewardship Committee; John Does, 21-40; Jane Does, 21-40

*Defendant*s

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 26, 2019

Filed: March 27, 2020
_____

Before SMITH, Chief Judge, WOLLMAN and ERICKSON, Circuit Judges.
_____

SMITH, Chief Judge.

Congress placed a religious exemption within the Employee Retirement Income Security Act of 1974 (ERISA). *See* 29 U.S.C. § 1002(33). The exemption covers retirement and pension plans of some religiously affiliated nonprofits. The central issue in this case is whether a multibillion dollar, religiously affiliated hospital's plan falls within that exemption. Because we find that the plan at issue falls within the exemption, we affirm in part and reverse and remand in part.

## I. *Background*

Sally Sanzone worked as a registered nurse for Mercy Health ("Mercy") for more than 25 years. During that time, she participated in the Retirement Plan for Employees of the Sisters of Mercy of the Americas, St. Louis, which is now known as the Mercy Health MyRetirement Personal Pension Account Plan ("the Plan"). Sanzone claims that Mercy sponsors the Plan and that the Mercy Health Benefits Committee ("the Committee") administers the Plan.

Mercy is a nonprofit corporation organized under Missouri law. It was founded in 1986 by the Sisters of Mercy ("the Order"), a religious order established by the Catholic Church. It has grown substantially since its founding; at the time Sanzone filed her complaint, Mercy and its subsidiaries operated hospitals in four states, employed more than 40,000 people, possessed $6.4 billion in assets, and earned operating revenues of about $5.3 billion. Given that growth, the Order transferred

sponsorship of Mercy to Mercy Health Ministry, which is a public juridic person[1] recognized by the Catholic Church. Mercy is governed by its board of directors ("the Board"), which consists of 5 to 17 members, at least 4 of whom must be Catholic.

The Committee includes five members, four of whom are sisters of the Order. According to the complaint, the Committee has all discretionary powers and authority to carry out the Plan. Mercy tasked the Committee with providing fiduciary oversight and various administrative tasks. It also tasked the Committee with creating a funding policy and method for the Plan, but the Committee delegated that duty to a subcommittee of the Board. Between December 2010 and June 2016, the Committee met seven times.

Sanzone filed suit against Mercy, alleging violations of federal and state laws.[2] Key here, she claimed that Mercy's plan management disregards ERISA's requirements. For example, ERISA requires covered plans to maintain certain funding levels and issue reports to beneficiaries. As of 2015, the Plan was underfunded by 29 percent, and in certain years, Mercy failed to make contributions to the Plan. Further, the Committee failed to provide summary plan descriptions, annual reports, notifications of failure to meet minimum funding, and other ERISA reports. Also, the Plan is not insured by the Pension Benefits Guaranty Corporation (PBGC).

---

[1]The Code of Canon Law provides that "[i]n the Church, besides physical persons, there are also juridic persons, that is, subjects in canon law of obligations and rights which correspond to their nature." 1983 Code c.113, § 2. "Public juridic persons are aggregates of persons . . . or of things . . . which are constituted by competent ecclesiastical authority so that . . . they fulfill in the name of the Church, . . . the proper function entrusted to them in view of the public good; other juridic persons are private." 1983 Code c.116, § 1.

[2]After Gene Grasle filed a similar suit, Sanzone voluntary transferred her case to the Eastern District of Missouri, where the cases were consolidated.

In response, Mercy asserted that it does not have to comply with ERISA's requirements because the Plan falls under ERISA's church-plan exemption. ERISA does "not apply to any employee benefit plan if . . . such plan is a church plan." 29 U.S.C. § 1003(b)(2). A church plan is "a plan established and maintained (to the extent required in clause (ii) of subparagraph (B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26." *Id.* § 1002(33)(A). The provision is expanded by two other definitions. One is the definition of "[a] plan established and maintained . . . by a church." *Id.* § 1002(33)(C)(i). Congress expanded that to include plans that are maintained by principal-purpose organizations:

> A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

*Id.* As the Supreme Court has noted, "[t]hat is a mouthful, for lawyers and non-lawyers alike." *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1656 (2017). Put simply, a principal-purpose organization is one that has the primary purpose or function of administering or funding a plan for the employees of a church, and it must be controlled by or associated with a church. *See id.* at 1656–57.

Congress also expanded "employee of a church" to include "an employee of an organization, whether a civil law corporation or otherwise, which is exempt from

-4-

tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches." 29 U.S.C. § 1002(33)(C)(ii)(II).[3]

Before the district court, Sanzone argued that the Plan was not a church plan and thus its failure to comply with ERISA violated the statute. In the alternative, Sanzone argued that the church-plan exemption violates the Establishment Clause. Mercy moved to dismiss. The district court dismissed the case for lack of jurisdiction. It found that there was no jurisdiction under ERISA because the Plan was a church plan and that Sanzone lacked standing to bring suit under the Establishment Clause. After dismissing all the federal claims, the court dismissed the remaining state law claims for lack of supplemental jurisdiction. *See Gibson v. Weber*, 431 F.3d 339, 342 (8th Cir. 2005) ("Congress unambiguously gave district courts discretion in 28 U.S.C. § 1367(c) to dismiss supplemental state law claims when all federal claims have been dismissed."). Sanzone now appeals.

## II. *Discussion*

"We review de novo the grant of a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1)." *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015) (quoting *Great Rivers Habitat All. v. Fed. Emergency Mgmt. Agency*, 615 F.3d 985, 988 (8th Cir. 2010)). "We must accept all factual allegations in the pleadings as true and view them in the light most favorable to the nonmoving party." *Great Rivers*, 615 F.3d at 988 (quoting *Hastings v. Wilson*, 516 F.3d 1055, 1058 (8th Cir. 2008)). Before we consider whether the Plan is a church plan, we address whether ERISA coverage is a jurisdictional issue or an element of a plaintiff's claim.

---

[3]On appeal, Sanzone does not contest that Mercy's employees satisfy this definition.

-5-

A. *Jurisdictional Issue*

Because it determined that the Plan was not covered by ERISA, the district court dismissed the case for lack of jurisdiction. In doing so, the court applied our precedent, which considered ERISA coverage as a jurisdictional issue. *See, e.g.*, *Chronister v. Baptist Health*, 442 F.3d 648, 654 (8th Cir. 2006) (finding that the court had subject-matter jurisdiction over ERISA claims because the plan at issue was not a church plan). Sanzone argues that our precedent is superseded by the Supreme Court's decision in *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006).

In *Arbaugh*, the Court considered "whether Title VII's employee-numerosity requirement, 42 U.S.C. § 2000e(b), is jurisdictional or simply an element of a plaintiff's claim for relief." *Id.* at 509. Given that courts have "sometimes been profligate in [their] use of the term" "jurisdiction," the Court provided clarity. *Id.* at 510. It stated that "[i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue." *Id.* at 515–16 (footnote omitted). "But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Id.* at 516.

"Applying that readily administrable bright line to [the] case," the Court noted that the relevant provision did "not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *Id.* at 515–16 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). Further, the provision was "separate" from and not referred to by 28 U.S.C. § 1331 and Title VII's jurisdictional provision, 42 U.S.C. § 2000e–5(f)(3). *Arbaugh*, 546 U.S. at 515. Therefore, the Court determined that Congress did not deem the numerosity limitation jurisdictional and held that courts should not either. *Id.* at 516.

Applying *Arbaugh* to ERISA, a number of our sister circuits have either reversed their prior position that ERISA coverage is a jurisdictional issue or noted that *Arbaugh* helps resolve the issue. *See Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 345–46 (5th Cir. 2014) (finding that the government-plan exemption was a merits issue and stating that "any contrary reading of [that circuit's precedent] cannot stand"); *see also Dahl v. Charles F. Dahl, M.D., P.C. Defined Benefit Pension Tr.*, 744 F.3d 623, 629 (10th Cir. 2014) ("We are persuaded by the reasoning of the Sixth Circuit that recent Supreme Court decisions compel the conclusion that the existence of a benefit plan subject to ERISA is not a jurisdictional requirement but an element of a claim under ERISA."); *Daft v. Advest, Inc.*, 658 F.3d 583, 590–91 (6th Cir. 2011) ("Therefore, in light of *Arbaugh* and its progeny, the existence of an ERISA plan must be considered an element of a plaintiff's claim under Section 502(a)(1)(B), not a prerequisite for federal jurisdiction. Indeed, this is the conclusion reached by several district courts that have considered this question in the wake of *Arbaugh*, even in the face of prior circuit precedent that treated the ERISA-plan requirement as jurisdictional in nature."); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 997 (9th Cir. 2010) ("Whether a particular 'Plan' is an employee benefit pension plan, and thus whether a particular defendant is subject to ERISA, 'is therefore a question on the merits of the claim, not an issue of subject matter jurisdiction.'" (alteration and citation omitted)).

Those holdings appear consistent with *Arbaugh*. ERISA does not expressly make coverage jurisdictional. In this case, the relevant provision states that ERISA "shall not apply to any employee benefit plan if . . . such plan is a church plan." 29 U.S.C. § 1003(b)(2). That provision is separate from the jurisdictional section, *see* 29 U.S.C. § 1132(e), and the jurisdictional section does not reference the church-plan exemption in any way. The church-plan exemption, like the numerosity provision in Title VII, does not refer to jurisdiction and is separate from any relevant jurisdictional provisions. Because of those similarities and the "bright line" language adopted by

the Court in *Arbaugh,* there is merit to our sister circuits' conclusions that ERISA coverage is a merits issue.

Yet we do not consider the issue on a blank slate. In two post-*Arbaugh* cases, we discussed ERISA coverage as a jurisdictional issue. *See Dakota, Minn. & E. R.R. v. Schieffer*, 711 F.3d 878, 880 (8th Cir. 2013) (affirming the district court's dismissal for lack of jurisdiction because the plan was not an ERISA plan and the contract claims were not governed by ERISA); *Chronister*, 442 F.3d at 651–54.

Mercy argues that those precedents require us to continue considering plan coverage as a jurisdictional inquiry. Typically, *stare decisis* requires this court to follow the opinions of prior panels. *Drake v. Scott*, 812 F.2d 395, 400 (8th Cir. 1987) ("One panel of this [c]ourt is not at liberty to disregard a precedent handed down by another panel."). "However, when an issue is not squarely addressed in prior case law, we are not bound by precedent through *stare decisis*." *Passmore v. Astrue*, 533 F.3d 658, 660 (8th Cir. 2008). "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). Further, "[w]e need not follow dicta." *John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers, AFL-CIO*, 913 F.2d 544, 550 (8th Cir. 1990). "Dicta is '[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential[.]'" *Passmore*, 533 F.3d at 661 (alterations in original) (quoting *Obiter Dictum*, Black's Law Dictionary (8th ed. 2004)).

Though jurisdiction was discussed in *Chronister* and *Dakota*, those discussions were unnecessary to the decisions. In *Chronister*, we determined that the plan at issue was not a church plan because the organization was not associated with a church. 442 F.3d at 653. Therefore, we concluded we had subject matter jurisdiction to address the merits of the case. *Id.* at 654. The key analysis in that opinion was whether the

plan was a church plan, not whether that status was relevant under a jurisdictional or merits inquiry. Put another way, because the plan was not a church plan, we were not required to address whether ERISA coverage over such a plan was a jurisdictional or merits issue. Regardless of whether ERISA coverage was jurisdictional or merits based, we would have found that the plan was not a church plan. Any discussion of jurisdiction was therefore unnecessary to the decision and is dicta.

Similarly, in *Dakota*, we concluded that the plan at issue did not constitute an ERISA plan. *Dakota, Minn. & E. R.R. v. Schieffer*, 648 F.3d 935, 938 (8th Cir. 2011). In a subsequent decision in the case, we addressed whether we still had subject matter jurisdiction, which would have been the case if the plaintiff sought to recover benefits under ERISA. *Dakota*, 711 F.3d at 880–81. Though we noted that "[w]here federal subject matter jurisdiction is based on ERISA, but the evidence fails to establish the existence of an ERISA plan, the claim must be dismissed for lack of subject matter jurisdiction," *id.* at 880 (internal quotation omitted), our decision turned on the benefits issue, not plan status. *Id.* at 882. We ultimately concluded that the agreement at issue—an employment agreement—was not an ERISA plan or related to an ERISA plan in such a way as to make the benefits due under ERISA. *Id.* That decision turned on 29 U.S.C. § 1132(a)(1)(B), which is not at issue in this case. *Id.* at 881. In consequence, *Dakota*, like *Chronister*, failed to directly address whether plan status was a jurisdictional inquiry.

To summarize, neither *Dakota* nor *Chronister* found that the relevant plans were ERISA plans. Therefore, neither panel had to squarely address whether ERISA coverage was a jurisdictional or merits inquiry and the impact that *Arbaugh* had on our prior precedent. Those questions were "merely lurk[ing] in the record;" they were not "brought to the attention of the court nor ruled upon." *Webster*, 266 U.S. at 511. Therefore, for purposes of those inquiries, *Dakota* and *Chronister* "are not to be considered as having been so decided as to constitute precedents." *Id.* Any discussion of jurisdiction in those cases was unnecessary to the holding and merely dicta.

Therefore, we find that *Arbaugh* controls over any of our subsequent dicta regarding jurisdiction. Pursuant to that precedent, we hold that whether a plan is an ERISA plan is an element of the plaintiff's case and not a jurisdictional inquiry.

## B. *Church-Plan Status*

That does not, however, conclude our analysis. Mercy briefed this case on both 12(b)(1) and 12(b)(6) grounds. "[A]n appellate court may treat a Rule 12(b)(1) issue as a Rule 12(b)(6) issue." *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 965 (8th Cir. 2011). To that end, we consider whether Sanzone has adequately pleaded that the Plan is not a church plan. In reviewing the merits, we "accept[] the well-pleaded allegations in the complaint as true and draw[] all reasonable inferences in favor of the plaintiff." *Varga v. U.S. Bank Nat'l Ass'n*, 764 F.3d 833, 838 (8th Cir. 2014). "In addition to the allegations in the amended complaint, we also may consider materials that are necessarily embraced by the pleadings." *Id.* (internal quotation omitted).

Sanzone argues that she is entitled to remand for two reasons. First, she argues that the district court erred in finding that the Plan was a church plan because it incorrectly interpreted the principal-purpose provision. Second, she argues that she is entitled to further discovery. We consider both arguments in turn.

### 1. *Statutory Interpretation*

As discussed above, ERISA exempts church plans from its requirements. *See* 29 U.S.C. § 1003(b)(2); *see also id.* § 1002(33). A church plan includes one that is *maintained* by a principal-purpose organization. *Id.* § 1002(33)(C)(i). And a principal-purpose organization is an *organization* that has the primary purpose or function of administering or funding a plan for the employees of a church, and it must be "controlled by or associated with a church." *Id.*

-10-

Because Sanzone does not contest that the Committee's primary purpose is administering the Plan and that it is associated with the Catholic church, the parties' arguments focus on whether the Committee (a) maintains the Plan and (b) constitutes an organization. Those arguments turn on the definitions of *maintain* and *organization* in ERISA. Sanzone argues that ERISA creates a context-specific definition of *maintain*. Under that definition, the Committee does not *maintain* the Plan. Mercy urges us to use the plain meaning of *maintain*, under which, it argues, the Committee maintains the Plan. The parties assert the same arguments for the term *organization*. Though the Supreme Court considered the principal-purpose provision in *Advocate*, it expressly left unanswered the question of whether hospitals' internal benefits committees constitute principal-purpose organizations. 137 S. Ct. at 1657 n.2.

"As usual, our job is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (alteration in original) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Yet "[i]nterpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). So we depart from the ordinary meaning only if the words "are otherwise defined in the statute itself," *Hennepin Cty. v. Fed. Nat'l Mortg. Ass'n*, 742 F.3d 818, 821 (8th Cir. 2014), or if "context requires a different result." *Gonzales v. Carhart*, 550 U.S. 124, 152 (2007).

a. *Maintain*

We begin our ordinary meaning inquiry with the simple dictionary definition from the time of the statute's enactment. *See, e.g.*, *Wis. Cent.*, 138 S. Ct. at 2070–71 (using dictionaries from 1942 and 1933 to interpret "money" in an act adopted in 1937). The relevant time period here is 1980, when the church-plan exemption was amended to its current form. One dictionary from that period defines *maintain* as

follows: "10.a. To cause to continue in a specified state, relation, or position." *Maintain*, Oxford English Dictionary (2d ed. 1989). A more recent dictionary provides similar definitions: "1. To continue (something)" or "4. To care for (property) for purposes of operational productivity." *Maintain*, Black's Law Dictionary (10th ed. 2009). The Tenth Circuit, which recently decided the same issue, applied a similar definition. *See Medina v. Catholic Health Initiatives*, 877 F.3d 1213, 1226 (10th Cir. 2017) ("[W]hen ERISA says that a church plan includes a plan 'maintained' by a principal-purpose organization, 29 U.S.C. § 1002(33)(C), it simply means the principal-purpose organization, as *Black's* says, 'cares for the plan for purposes of operational productivity.'").

Considering Sanzone's own allegations, we find that the Committee's activities satisfy the plain meaning of *maintain*. The complaint states that "Mercy is required to designate the Committee which has sole responsibility for administration of the Plan." Consolidated Second Am. Class Action Compl. ¶ 118, *Sanzone v. Mercy Health*, No. 4:16-cv-923 (E.D. Mo. Aug. 23, 2017), ECF No. 145 (hereinafter "Compl."). It also states that the Committee has a laundry list of other powers:

> The . . . Committee's responsibilities include plan administration, interpreting the Plan to determine all questions arising in the administration, interpretation and application of the Plan, adopting rules for the Plan, employing accountants, actuaries, counsel, specialists and other persons necessary to help carry out the Committee's duties and responsibilities under the Plan, issuing directions to the Trustee concerning all benefits which are to be paid from the Trust Fund pursuant to provisions of the Plan, directing the Trustee's exercise of its powers in the administration and investment of the Trust Fund, making all decisions and determinations concerning the right of any person to a benefit under the Plan, requiring each Participating Employer to keep such books, records, and other data as it deems necessary for the proper administration of the Plan, exercising discretion to determine that the Participating Employers pay or reimburse any reasonable costs and expenses of the Plan, and monitoring other fiduciaries.

-12-

*Id.* ¶ 137. Perhaps most damaging, the complaint states that "[t]he Benefits Committee has all discretionary powers and authority necessary to carry out the provisions of the Plan." *Id.* ¶¶ 136, 158(A).

And so the powers referred to in the complaint include interpreting and applying the Plan, the monitoring of fiduciaries, and all powers necessary to carry out the Plan. Those are more than managerial tasks. These allegations indicate that the Committee "cares for the [P]lan for purposes of operational productivity," *Medina*, 877 F.3d at 1226 (quoting *Maintain*, Black's Law Dictionary (9th ed. 2009)), that the Committee "continue[s]" or "care[s] for" the Plan, *Maintain*, Black's Law Dictionary (10th ed. 2009), and that the Committee "cause[s] [the Plan] to continue" and "secure[s] the continuance of" the Plan. *Maintain*, Oxford English Dictionary (2d ed. 1989). Thus, under *maintain*'s ordinary meaning, the Committee maintains the Plan.

Sanzone claims the ordinary meaning is inappropriate for two reasons. First, she argues that the ordinary meaning of *maintain* is too similar to the definition of *administer*, so applying that meaning would render *administer* redundant. Yet Sanzone's argument disregards the difference between the plain meaning of *administer* and *maintain*. *Administer* means to "manage as a steward, to carry on, or execute (an office, affairs, etc.); to manage the affairs of (an institution, town, etc.)." *Administer*, Oxford English Dictionary (2d ed. 1989). It can also mean "[t]o manage (work or money) for a business or organization" or "[t]o provide or arrange (something) officially as part of one's job." *Administer*, Black's Law Dictionary (10th ed. 2009). In summary, *administer* means to manage or execute, whereas *maintain* means to continue or care. One looks to tasks, while the other considers continuity and longevity. Thus, the terms' meanings are not so similar as to render one redundant.

-13-

Second, Sanzone claims that, pursuant to precedent and ERISA's context, the word *maintain* means to "commit to, and have the ultimate responsibility for, providing benefits." Appellants' Br. at 40.

We disagree. For one, none of the precedents cited expressly or implicitly define maintain. *See, e.g.*, *Advocate*, 137 S. Ct. at 1661 (discussing the importance of maintaining compared to establishing a plan); *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12–15 (1987) (finding that ERISA's purpose would not be served if a Maine law was preempted because the state law "create[d] no impediment to an employer's adoption of a uniform benefit administration scheme"); *Cole v. Int'l Union, United Auto., Aerospace & Agric. Implementation Workers of Am.*, 533 F.3d 932, 936–37 (8th Cir. 2008) (discussing the factors that indicate "whether a plan has the requisite administrative scheme to qualify as an ERISA . . . plan").

Neither does ERISA. The word is used repeatedly throughout the statute. The majority of those uses simply connect the maintenance of a plan to an entity; they do not define what constitutes maintaining a plan. *See, e.g.*, 29 U.S.C. § 1002(1) ("The terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program . . . established or maintained by an employer or by an employee organization . . . ."); *id.* § 1002(32) ("The term 'governmental plan' means a plan established or maintained for its employees by the Government of the United States . . . ."); *id.* § 1222(a)(3) ("The Joint Pension . . . Task Force shall . . . make a full study and review of . . . the appropriate treatment under subchapter III of this chapter (relating to termination insurance) of plans established and maintained by small employers . . . ."). In other places, the word refers to the obligation to keep records or documents, or to keep costs at a certain level. *See, e.g.*, *id.* § 1027 ("Every person subject to a requirement to file any report . . . shall maintain a copy of such report . . . ."); *id.* § 1059(a)(2) ("If more than one employer adopts a plan, each such employer shall furnish to the plan administrator the information necessary for the administrator to maintain the records, and make the reports, required by paragraph

-14-

(1)."); *id.* § 1001b(b)(3) ("The Congress further finds that modification of the current termination insurance system and an increase in the insurance premium for single-employer defined benefit pension plans . . . is necessary to maintain the premium costs of such system at a reasonable level . . . ."). The statute provides no guidance that the word has a denotation other than its ordinary meaning.

Sanzone argues that one particular provision supports her offered definition. In that provision, ERISA defines *administrator* and *plan sponsor*:

> (A) The term "administrator" means—
>
>> (i) the person specifically so designated by the terms of the instrument under which the plan is operated;
>>
>> (ii) if an administrator is not so designated, the plan sponsor; or
>>
>> (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.
>
> (B) The term "plan sponsor" means (i) the employer in the case of an employee benefit plan established or maintained by a single employer, (ii) the employee organization in the case of a plan established or maintained by an employee organization, or (iii) in the case of a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organizations, the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan.

*Id.* § 1002(16). Relying on that provision and case law, Sanzone argues that plan sponsors have two groups of powers—fiduciary powers and the power "to adopt, modify, or terminate welfare plans." *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995). Section 1002(16)(A) allows sponsors to delegate fiduciary powers

to administrators. Yet, she points out, the statute does not contemplate plan sponsors relinquishing the power to adopt, modify, or terminate welfare plans. Further, § 1002(16)(B) consistently identifies the sponsor as the entity that establishes and maintains the plan. Hence, Sanzone asserts, the retained powers—the power to "adopt, modify, or terminate" welfare plans, or "making the benefit commitment and designing the terms of the plan"—are related to or synonymous with established or maintained. Appellants' Br. at 49, 51.

Sanzone's reliance on § 1002(16) fails. "The case must be a strong one indeed, which would justify a Court in departing from the plain meaning of words . . . in search of an intention which the words themselves did not suggest." *United States v. Wiltberger*, 18 U.S. 76, 96 (1820). The referenced language simply does not warrant a departure from the plain meaning of *maintain*. First, we note that nothing in § 1002(16) purports to define *maintain* or references the power to adopt, modify, terminate, make benefit commitments, or designate terms of a plan. Second, applying Sanzone's definition would produce undesirable interpretational results. Sanzone's definition requires an organization to have authority over the adoption, modification, termination, benefit commitments, or terms of a plan in order to maintain it. Yet to constitute a principal-purpose organization, the organization must be "*controlled by* or associated with a church or a convention or association of churches." 29 U.S.C. § 1002(33)(C)(i) (emphasis added). Sanzone's definition vitiates the control requirement. Consider an organization that satisfies the provision because it administers a plan and is controlled by a church. That organization might have the ability to adopt, modify, or terminate a plan, but it would still answer to the church for those decisions because the church controls it. The organization would lack the final authority or ultimate responsibility for the plan that Sanzone's definition hinges on. Thus, we prefer the construction that enables us to "give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)).

In short, Sanzone has failed to show that ERISA's context requires a deviation from the ordinary meaning of *maintain*. And under that ordinary meaning, the Committee maintains the plan.

### b. *Organization*

We next address Sanzone's argument that the Committee does not constitute an *organization*. The principal-purpose provision requires an *organization* to maintain the plan. 29 U.S.C. § 1002(33)(C)(i). We will apply the term's ordinary meaning. The district court cited numerous definitions, which found that an "'organization' [w]as an administrative and functional structure," or "a group of people who work together in an organized way for a shared purpose." *Sanzone v. Mercy Health*, 326 F. Supp. 3d 795, 805 (E.D. Mo. 2018) (first quoting *Organization*, Merriam-Webster's II Collegiate Dictionary (10th ed. 2002), then quoting *Organization*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/organization (last visited Oct. 28, 2019)). Other dictionaries provide similar definitions. *See Organization*, Oxford English Dictionary (3d ed. 2004) ("An organized body of people with a particular purpose, as a business, government department, charity, etc."); *Organization*, Black's Law Dictionary (10th ed. 2009) ("A body of persons (such as a union or corporation) formed for a common purpose.").

Applying like definitions, the Tenth Circuit considered whether a hospital's benefits committee was an *organization*. *Medina*, 877 F.3d at 1226. There, the benefits subcommittee had "a Chair and four or five voting members" and its purpose was to "provid[e] for the proper operation, administration[,] and maintenance of the Plan." *Id.* (internal quotation omitted). Because its structure and activities satisfied *organization*'s plain meaning, our sister circuit found that the committee constituted an organization. *Id.*

-17-

Doing the same here, we find that the Committee constitutes "a group of people who work together in an organized way for a shared purpose." *Sanzone*, 326 F. Supp. 3d at 805 (quoting *Organization*, Cambridge Dictionary, https://dictionary. cambridge.org/us/dictionary/english/organization (last visited Oct. 28, 2019)). It is a group of people; the Committee has five members—four of whom are sisters of the Order. As for its purpose, the complaint states that the "Committee provides fiduciary oversight for Mercy's employee benefit programs and retirement Plan, including for the Mercy Plan." Compl. ¶ 20. Therefore, because it is a group that works together for a common purpose, the Committee satisfies the ordinary meaning of *organization*.

Again, Sanzone suggests that the ordinary meaning is too broad in light of the statute's operation. Specifically, she argues that ERISA distinguishes between (1) church-associated organizations that can maintain plans, (2) principal-purpose organizations that can maintain plans, and (3) other church-associated organizations that cannot maintain plans. Applying the ordinary meaning of *organization* allows the third category to create the second. That, Sanzone claims, allows entities that Congress intended ERISA to cover to avoid the statute's requirements. Put another way, she believes that the exception swallows the rule if the ordinary meaning of *organization* applies.

We disagree. Most importantly, the text of ERISA does not bar any entity from creating a principal-purpose organization. Further, it is unclear what organizations would satisfy Sanzone's standard. She "would only allow the exemption for wholly independent bodies, constituted with the principal purpose of administering or funding a retirement plan, and endowed with the power to modify or terminate that plan." *Medina*, 877 F.3d at 1226. Our sister circuit rejected that structure because, although "[t]here may be some organization out there that is structured like that, . . . it certainly is not the most intuitive way to do it." *Id.* at 1227. "[I]t is not clear what the advantage of such a structure would be, or why Congress would have required it." *Id.*

All in all, it would render the provision nearly inoperable. We decline to interpret the term in such a manner.

At bottom, the statutory context does not suggest that we need to depart from the plain meaning of *organization*, so we decline to do so. In consequence, we find that the Committee, with the powers alleged in the complaint, maintains the Plan and is a principal-purpose organization under the statute. Therefore, Sanzone has failed to plead a plan that is governed by ERISA, and thus her claims under ERISA fail.

## 2. *Discovery Issue*

Sanzone argues that, even if the district court applied the correct statutory definitions, it abused its discretion by deciding the issue *sua sponte*, effectively denying her "the opportunity for . . . discovery to establish [her] claim." *See Pudlowski v. The St. Louis Rams, LLC*, 829 F.3d 963, 964 (8th Cir. 2016) (per curiam).

Specifically, she argues that, per *maintain*'s ordinary meaning, the Committee does not care for the Plan. The complaint alleges that the Committee met seven times between the beginning of December 2010 and the end of June 2016. Compl. ¶¶ 141–42. It also states that the Committee delegated their power to set funding policy to a committee of the Board. *Id.* ¶ 139. Sanzone argues that these two facts indicate that the Committee could not be the entity ensuring that the Plan, which has hundreds of millions of dollars in assets, continues. Considering a similar argument, the Seventh Circuit remanded a motion for summary judgment back to the district court for further discovery. *Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 870–71 (7th Cir. 2019).

The defendants claim Sanzone waived that argument by not presenting it to the district court. We agree. "We have often explained that arguments not presented to

the court below will not be considered on appeal." *Glover v. McDonnell Douglas Corp.*, 150 F.3d 908, 909 (8th Cir. 1998). Her complaint and documents below mention facts that support her claim for further discovery, but Sanzone did not argue that she was entitled to additional discovery. Merely mentioning the facts—even in context of another argument—is not enough to preserve the argument. *See Ames v. Nationwide Mut. Ins. Co.*, 760 F.3d 763, 770–71 (8th Cir. 2014) (finding that an argument was not preserved by facts in the court filings that suggested the argument was valid). Nor did Sanzone indicate what additional discovery would have yielded. *See Pudlowski*, 829 F.3d at 964–65 (finding the district court abused its discretion by declining to allow additional jurisdictional discovery where a party submitted affidavits that indicated that the parties were diverse); *Lakin v. Prudential Sec., Inc.*, 348 F.3d 704, 712–13 (8th Cir. 2003) (finding the district court abused its discretion by not allowing further discovery regarding the existence of general jurisdiction where the appellants filed a motion requesting such discovery). Because Sanzone did not assert this argument below or offer proof as to what additional discovery would have revealed, we find that the argument was waived.

Consequently, we find that Sanzone failed to adequately state a claim under ERISA because the Plan, as alleged, is a church plan. Further, she waived any claim for additional discovery by not requesting it below.

### C. *Establishment Clause Standing*

Sanzone argues that, if the Plan is a church plan, the church-plan exemption violates the Establishment Clause. The district court dismissed that argument because it found that Sanzone lacked standing to challenge the statute. "It is well established that standing is a jurisdictional prerequisite that must be resolved before reaching the merits of a suit." *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007). There are three elements to standing: (1) "the plaintiff must have suffered an 'injury in fact,'" (2) "there must be a causal connection between the injury and the

conduct complained of," and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted). An injury in fact must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (cleaned up). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561. "[W]hen a motion to dismiss is made on standing grounds the standing inquiry must, as a prerequisite, be done in light of the factual allegations of the pleadings." *Mineta*, 495 F.3d at 570.

The district court determined that Sanzone only "raise[d] the specter of a potentially underfunded Plan in the future without ERISA protections." *Sanzone*, 326 F. Supp. 3d at 809. That was not enough to establish a concrete, redressable harm. When a plan is underfunded, there is no direct impact on the beneficiaries. They only feel an effect if the underfunding leads to a reduction in their benefits. Because that is a potential, future injury, a "plaintiff must demonstrate that the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *In re SuperValu, Inc.*, 870 F.3d 763, 769 (8th Cir. 2017) (cleaned up).

We agree with the district court that the underfunding here does not meet that standard. Sanzone admits that Mercy would have sufficient assets to pay the Plan's benefits for 9.5 years if it never made another contribution to the Plan. Appellants' Br. at 10. That is not "certainly impeding." *SuperValu*, 870 F.3d at 769. And although the Plan is underfunded by hundreds of millions of dollars, Mercy is a multibillion-dollar nonprofit. Addressing a similar alleged injury, the Sixth Circuit found that the underfunding was a hypothetical injury. *See Duncan v. Muzyn*, 885 F.3d 422, 428 (6th Cir. 2018) ("Plaintiffs will only be harmed *if* the Plan runs out of money and *if* the TVA refuses to make up the shortfall *while* Plaintiffs are still receiving benefits from the Plan. . . . [O]ur sister circuits have concluded that plaintiffs lack standing premised on similar injuries."). Under these facts, we agree.

-21-

Nonetheless, at oral argument, Sanzone identified four specific injuries pleaded in the complaint:

> [1] the Plan is underfunded by hundreds of millions of dollars, . . . [2] because it doesn't have ERISA protections, there are no funding obligations . . . for the Plan, [3] the Pension Benefit Guarantee Corporation does not ensure the benefits of this Plan, and [4] participants . . . don't have any of the notice provisions that would tell them how to plan for their future because [the defendants] aren't required to give them if it is a church plan.

Oral Arg. at 4:11–4:47. Those injuries are indeed alleged in various provisions of the complaint. *See* Compl. ¶ 290 ("The church plan exemption, as claimed by Mercy, places its thousands of longtime employees' justified reliance on their pension benefits at great risk, including because the Plan is uninsured and underfunded. In addition, Mercy fails to provide the multitude of other ERISA protections designed to safeguard its employees' pensions."); *id.* at 68 (praying the court remedy the situation by "[r]equiring Mercy to fund the Mercy Plan in accordance with ERISA's funding requirements, disclose required information to the Mercy Plan's participants and beneficiaries, and otherwise comply with all other reporting, vesting, and funding requirements of . . . ERISA").

The district court and Mercy failed to address many of those injuries—most importantly, the deprivation of ERISA protections. Those protections include ERISA's funding requirements, Pension Benefit Guarantee Corporation insurance, and notice requirements. But for the church-plan exemption, Sanzone would be able to sue under ERISA to enforce those protections. The inquiry, therefore, is whether the deprivation of the specified ERISA protections constitutes a sufficient injury to confer standing.

Though raised by Sanzone below, the district court did not consider that specific question. "When a district court fails to address a matter properly presented to it, we ordinarily remand to give the court an opportunity to rule in the first instance." *GEICO Cas. Co. v. Isaacson*, 932 F.3d 721, 724 (8th Cir. 2019). We follow that principle here. Therefore, we remand to the district court to determine whether the deprivation of ERISA protections confers Article III standing, and if so, whether the church-plan exemption violates the Establishment Clause. If there is Article III standing, the state law claims should be reinstated pursuant to the court's supplemental jurisdiction. *See* 28 U.S.C § 1367.

## III. *Conclusion*

For the foregoing reasons, the decision of the district court is affirmed in part and reversed and remanded in part.

_____